# In the United States Court of Federal Claims

No. 12-402C

(Filed Under Seal:  November 6, 2012)

Reissued:  November 26, 2012[1]

_____

| | |
|---|---|
| REEMA CONSULTING SERVCES, INC.,<br><br>     Plaintiff,<br><br>  v.<br><br>THE UNITED STATES,<br><br>     Defendant. | &ast;<br>&ast; Post-award bid protest; Cross-motions for<br>&ast; judgment on the administrative record;<br>&ast; Plaintiff lacks standing to challenge agency<br>&ast; corrective action; Bid proposal and<br>&ast; preparation costs; Standard for the award of<br>&ast; bid proposal and preparation costs; Plaintiff<br>&ast; failed to show that it unnecessarily incurred<br>&ast; costs due to a prejudicial error committed by<br>&ast; defendant.<br>&ast;<br>&ast; |

_____

## OPINION

_____

*Donald James Walsh*, Offit, Kurman, P.A., Owings Mills, MD, for plaintiff.

*Nicholas Jabbour*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

   In this bid protest case, Reema Consulting Services, Inc. (Reema) challenges actions taken by the United States Army, Edgewood Chemical Biological Center (ECBC) in regards to a contract to provide environmental sciences support services.  It seeks both injunctive relief and an award of bid preparation and proposal costs.  The parties have filed cross-motions for

_____

[1] An unredacted version of this opinion was issued under seal on November 6, 2012. The parties were given an opportunity to propose redactions and jointly proposed that the court redact information regarding the identify of one of the unsuccessful offerors.  The cited information, however, neither involves a trade secret nor is otherwise protected.  Accordingly, the court rejects these proposed redactions.  Nonetheless, the court has incorporated some minor changes into this opinion.

judgment on the administrative record.  For the reasons that follow, the court **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** defendant's cross-motion.  It finds that plaintiff is entitled to neither injunctive relief nor bid preparation and proposal costs.

## I.    BACKGROUND

The administrative record in this case reveals the following:

On July 16, 2009, ECBC issued Request for Proposals (RFP) No. W911SR-09-R-0018 for a contract to provide environmental, safety, health, and research support for operations at ECBC.[2]  The RFP envisioned the award of an indefinite-quantity, indefinite-delivery (IQID) contract with a period of performance of sixty (60) month and minimum and maximum values of $100,000 and $48,500,000, respectively.  Within the RFP, a detailed statement of work (SOW) informed potential offerors that task orders could encompass fourteen (14) different categories of mission-critical duties, including collection and analysis of chemical and biological samples, on-site inspections of workplaces, handling chemical and biological agents, maintenance and testing of equipment, and operation of ECBC's information technology system.  The SOW indicated that "[t]he Contractor . . . shall furnish the necessary resources (except for those delineated in the separate task orders as Government furnished property or assistance) to accomplish [the] tasks."[3]  The RFP indicated that only small businesses eligible under the 8(a) program of the Small Business Administration (SBA) could compete for the award.[4]

Under the RFP, each offeror's proposal was to consist of three volumes, each dedicated to an evaluation factor:  (i) technical/management; (ii) past performance; and    (iii) cost.  In the technical/management and cost volumes, offerors were to respond to two sample evaluation tasks; ECBC reserved the right to issue task orders for those two tasks at the prices proposed by the contract awardee.  Task 1 involved support for the Environmental Monitoring Laboratory through the collection and analysis of air and environmental samples for chemical agents, associated decomposition products, and characterization analysis.  Task 2 involved maintaining and managing a database for sample collection and analysis data.

Section L.3.1 of the RFP, which listed the requirements for the technical/management part of the proposal, required each offeror to include certain "UNCOSTED information that will be used to determine cost realism" for each of the two evaluation tasks.  The "UNCOSTED information" was to include, *inter alia*, "[a] detailed breakdown of equipment and materials, as

---

[2]  According to the RFP, ECBC "provides executive management of Army and Joint Service Nuclear, Biological, and Chemical (NBC) defense research development, an engineering program for NBC defense systems, and serves as the single executive agent throughout each program's life cycle."

[3]  Section H of the RFP contained special contract requirements, among them, several extensive lists of government-furnished property "which may be provided for use by the Contractor under specific Task Orders."

[4]  The North American Industry Classification System (NAICS) code for the requirement was 541620 (Environmental Consulting Services) and the size standard was $7 million.

appropriate, identifying specific equipment and showing specific materials that will be required," as well as the "[e]stimated quantities for materials and equipment." The "UNCOSTED information" was to "correlate with the information submitted in accordance with [the cost volume]." The offeror was also to discuss the facilities that it and its subcontractor would use to perform work off-site, a personnel plan, a management plan, and information on its proposed approach.

Section L.3.3 of the RFP established the requirements for the cost portion of the offerors' proposals. It began by stating that "[s]ubmission of cost or pricing data is not required." Nevertheless, it instructed offerors to "prepare a cost proposal which shall include a breakout of cost and fee for evaluation tasks 1 and 2, and provide information other than cost and pricing data that is adequate for evaluating the reasonableness of the price and determining cost realism." It emphasized that "THE BURDEN OF PROOF AS TO COST CREDIBILITY RESTS WITH THE OFFEROR." This section of the RFP further advised that "[t]he offeror must furnish supporting breakdowns for each cost element within each task" for a variety of "basic cost elements," including "Materials. Specify type, quantity, unit cost, total cost, and overhead."

The section of the RFP that described Task 1 indicated, at several points, that the government would furnish certain materials to the contractor. By way of example, section 6.0, entitled "Government Furnished Property or Assistance," stated that "[t]he Government will provide the . . . laboratory and laboratory facilities located in [certain specified buildings and] the necessary and type of equipment to perform specified requirements outlined in this task order."[5] The only provision relating to Task 1 that mentioned the contractor providing equipment, subsection 3.8, stated:

> 3.8 <u>Equipment Purchase</u>. The Contractor shall purchase necessary equipment and supplies required to maintain and continue safe, efficient and effective operations on site. This requirement may occur when equipment malfunctions or become [*sic*] inoperable on-site or during non-working hours and need [*sic*] to be replaced. Equipment and supplies shall be closely coordinated with Government personnel. However, approximately $6,000.00 per month may be expected to be spent on materials and supplies in support of this task. . . . The Government will reimburse the Contractor for actual costs accrued.

The contractor was required to submit periodic status reports concerning its expenditures for supplies and equipment.

Section M of the RFP indicated that the "[a]ward will be made to the responsible offeror whose proposal conforms to the solicitation requirements and represents the best value to the Government using the tradeoff process." The tradeoff process permitted "tradeoffs among the specific evaluation factors and will allow award to other than the lowest priced offeror or other than the highest technically rated offeror." The RFP listed three evaluation factors: (i) technical/management; (ii) past performance; and (iii) cost. Under the technical/management

---

[5] This segment provided a nonexclusive list of "typical analytical instrumentation" that would be provided by the government.

factor, each offeror was to be evaluated on four subfactors:  (a) proposed approach; (b) personnel plan; (c) management plan and tools; and (d) facilities.  The technical/management factor was "significantly more important than the Past Performance Factor, which is more important than the Cost Factor."  Within the technical/management factor, the proposed approach subfactor was "more important than" the other subfactors.  The personnel plan and management plan and tools subfactors were "equally important and individually . . . significantly more important than" the facilities subfactor.  The evaluators were to assign the technical/management factor and subfactors adjectival ratings of excellent, good, satisfactory, or unsatisfactory.[6]  Each technical/management factor and subfactor was also to receive a proposal risk rating of low risk, moderate risk, or high risk.  Past performance was to be evaluated and assigned an adjectival rating of low risk, moderate risk, high risk, or unknown risk.

With respect to the cost factor, the RFP indicated that "[t]he Government will evaluate the offeror's proposed cost/price for realism, reasonableness, and completeness."  It indicated that the proposals for evaluation Tasks 1 and 2 would "be evaluated on the probable cost of performance."  For cost realism purposes, the latter cost was defined as "the Government's best estimate of contract cost resulting from the offeror's proposal," which could "involve an adjustment of the [offeror's] proposed cost, and fee, whenever it is determined that the proposed cost does not reflect the probable cost of performance."  "Any adjusted cost will represent the Government's estimate of probable cost that will be used in the final evaluation to determine best value."  This segment then provided guidance on how the cost realism, reasonableness, and completeness analyses would be performed, stating as to the last of these that "[t]he Government will evaluate cost completeness to determine if the costs are complete in terms of adequacy of the identification, estimation, and support of all relevant costs."

On August 24, 2009, three offerors – Reema, Bowhead Systems Management, Inc. (Bowhead), and the eventual awardee, SM Resources Corporation, Inc. (SMRC) – submitted proposals in response to the RFP.[7]  Per the instructions outlined above, the technical/ management and cost portions of these proposals contained provisions regarding the equipment and materials related to Task 1.  Reema's technical/management volume noted that it was experienced in supplying "gases and coolants" and "supplies," but did not provide a detailed breakdown of equipment and materials, as required by section L.3.1 of the RFP.  In the portion of the technical/management volume relating to labor requirements for Task 1, Reema wrote, "Materials:  None.  We interpret [the government furnished property subsection] as indicating that all equipment and materials will be provided as [government furnished equipment] for this Task."  SMRC's technical/management volume contained a similar – if not less detailed – description of its experience in purchasing equipment and materials, such as "gases, chemicals,

---

[6]  The RFP explained that the "unsatisfactory" rating was warranted where the "proposal fails to demonstrate an understanding of the Government's requirements and fails to meet the minimum performance or capability requirements," and where "[t]here is a low probability that all requirements will be met or can only be met with major changes to the proposal."

[7]  Reema's proposed subcontractor was SciTech Services, Inc. (SciTech), the incumbent subcontractor; SMRC's proposed subcontractor was STEM International, Inc. (STEM), the incumbent contractor.

and other goods and services," and similarly did not provide the breakdown required by section L.3.1.

The cost volume of Reema's proposal indicated that it would "purchase the necessary equipment and supplies, such as gases, cylinders, uniform shoes, etc.," adding that "[t]he materials cost has not been included in the cost calculations as the quantities will be requested by the Government." Reema's cost volume also included a chart with a cost summary for the two evaluation tasks; with respect to Task 1, this chart left blank the item for "Direct Material/Equipment." Like Reema's proposal, SMRC's cost volume contained a generic list of equipment that SMRC would purchase. However, unlike Reema's proposal, SMRC included $6,000 per month for "Other Direct Costs," thereby incorporating in its costs for its Task 1 proposal a figure corresponding to the estimate for equipment purchases that had been set forth in section 3.8 of the RFP.

On March 7, 2011, ECBC's technical/management subgroup submitted its evaluation report for the three proposals. The subgroup assigned the offerors the following ratings with respect to the technical/management factor and relevant subfactors:

| | Reema | SMRC | Bowhead |
|---|---|---|---|
| Technical/Management Merit | | | |
| Factor 1: Technical/ Management | Satisfactory | Satisfactory | Satisfactory |
| Subfactor 1.1: Proposed Approach | Satisfactory | Satisfactory | Satisfactory |
| Subfactor 1.2: Personnel Plan | Satisfactory | Good | Satisfactory |
| Subfactor 1.3: Mgmt. Plan and Tools | Satisfactory | Satisfactory | Satisfactory |
| Subfactor 1.4: Facilities | Satisfactory | Satisfactory | Satisfactory |
| Proposal Risk | | | |
| Factor 1: Technical/ Management | Moderate Risk | Low Risk | Moderate Risk |
| Subfactor 1.1: Proposed Approach | Low Risk | Low Risk | Low Risk |
| Subfactor 1.2: Personnel Plan | Moderate Risk | Low Risk | Moderate Risk |
| Subfactor 1.3: Mgmt. Plan and Tools | Low Risk | Low Risk | Low Risk |
| Subfactor 1.4: Facilities | Low Risk | Low Risk | Low Risk |

The subgroup's evaluation report identified various strengths and weaknesses regarding Reema's proposal – as it had with the other offerors' proposals – but did not mention the equipment and materials requirement for Task 1. Reema was awarded a "satisfactory" rating for overall merit in the technical/management subgroup's report. By comparison, SMRC received the same technical/management merit ratings as Reema, except that SMRC received a "good" rating under the personnel plan subfactor. For proposal risk, Reema received a "moderate risk" for its

personnel plan, leading it to receive a "moderate risk" on its overall proposal.  By comparison, SMRC received "low risk" ratings for the technical/management factor and its subfactors.

On March 24, 2011, the technical/management subgroup produced a cost realism report. The subgroup used information gleaned from the technical/management volumes to "evaluate[] the realism" of the offerors' "uncosted information."  The report was intended to assist the cost subgroup in determining whether the proposed costs were realistic and whether the offeror understood ECBC's requirements and could support the proposed technical performance.  The cost realism report stated, with respect to Reema's Task 1 equipment and materials proposal, that "[n]o additional direct material costs were presented for consideration in this proposal.  The RFP indicates that $6,000 per month may be expected to be spent on materials and supplies in support of this task."  It further found that Reema had "successfully demonstrated a realistic amount of resources for the technical approach proposed," and "an adequate understanding of the Government's requirements."  But, it caveated that Reema "references the need to provide material in the proposal, but does not actually present any direct material costs," concluding that "[t]he proposal, therefore, does not fully demonstrate that the Offeror understands the materials requirements."  While the cost realism report for SMRC found that it also had demonstrated an understanding of the government's requirements, that report contained none of the qualifications that had been raised as to Reema.

On April 28, 2011, the cost subgroup produced a cost analysis report.  In this report, the cost subgroup "reviewed the Technical[] Subgroup's evaluation along with the other price aspects of each proposal to assist the Contracting Officer in determining if the price is fair and reasonable."  The cost subgroup adjusted proposed costs for Tasks 1 and 2 to arrive at the "most probable cost."  While Reema proposed an overall cost of $783,089.40, the cost subgroup adjusted this figure to arrive at a "most probable cost" of $968,132.64.  Part of this adjustment for Task 1 reflected Reema's failure to include the estimated material cost of $6,000 per month as was indicated in the RFP.  With respect to Reema's proposal, the cost subgroup stated:  "No direct material costs were presented for consideration in this proposal.  The offeror references the need to provide material in the proposal but does not actually present any direct material costs."[8] The same report adjusted SMRC's proposal to increase its proposed cost from $830,354.81 to a "most probable cost" of $837,914.63.

On May 2, 2011, ECBC forwarded a source selection evaluation team report to the source selection authority (SSA), summarizing the results of the subgroups' reports.  On September 22, 2011, the SSA produced a source selection decision.  In her decision, the SSA modified the findings made by the various subgroups.  She adjusted Reema's "most probable cost" down to $882,097.16, but kept in that figure the amount attributable to the Task 1 estimated material cost of $6,000 per month, as was indicated in the RFP.  The SSA also adjusted Reema's adjectival rating on the proposed approach subfactor under the technical/management factor.  In this regard, she observed:

---

[8]  The cost subgroup concluded that SMRC's "material estimate is based on the government's recommendation [of $6,000 per month] and is acceptable."  As with Reema's proposal, however, the report stated that SMRC "references the need to provide material in the proposal, but does not actually present any direct material costs."

> After reviewing the cost realism analysis and their suggested adjustments for failing to provide materials in the cost portion of their proposal along with their statement that "The materials cost has not been included in the cost calculations as the quantities will be requested by the Government", my opinion is that it is a deficiency.  In addition, the [RFP] and paragraph L.3.1.1.5.1.2 require a detailed breakdown of equipment.  It is my opinion that this rating should be unsatisfactory since it fails to meet the minimum RFP requirements.

The SSA also assigned Reema a deficiency for failing to include a breakdown of materials and their cost in its cost volume.  Noting that the "proposed approach was the most important sub factor," the SSA posited that "having an Unsatisfactory rating and deficiency for the most important sub factor renders the entire factor Unsatisfactory."  Finally, the SSA raised the risk profile for Reema's proposed approach subfactor from "low risk" to "high risk" because Reema failed to include "a detailed breakdown of equipment . . . in their proposal."

Despite the fact that SMRC's proposal likewise failed to provide a "breakdown of equipment," the SSA adjusted neither its ratings nor its risk assessments.  The SSA did adjust SMRC's price back to the original proposed cost ($830,354.81).

As a result of these adjustments, the SSA's final ratings and risk assessments were as follows (with changed ratings in bold):

| | **Reema** | **SMRC** | **Bowhead** |
|---|---|---|---|
| **Technical/Management Merit** | | | |
| Factor 1: Technical/ Management | **Unsatisfactory** | Satisfactory | **Unsatisfactory** |
| Subfactor 1.1: Proposed Approach | **Unsatisfactory** | Satisfactory | Satisfactory |
| Subfactor 1.2: Personnel Plan | Satisfactory | Good | **Unsatisfactory** |
| Subfactor 1.3: Mgmt. Plan and Tools | Satisfactory | Satisfactory | Satisfactory |
| Subfactor 1.4: Facilities | Satisfactory | Satisfactory | Satisfactory |
| **Proposal Risk** | | | |
| Factor 1: Technical/ Management | **High Risk** | Low Risk | **High Risk** |
| Subfactor 1.1: Proposed Approach | **High Risk** | Low Risk | Low Risk |
| Subfactor 1.2: Personnel Plan | Moderate Risk | Low Risk | **High Risk** |
| Subfactor 1.3: Mgmt. Plan and Tools | Low Risk | Low Risk | Low Risk |
| Subfactor 1.4: Facilities | Low Risk | Low Risk | Low Risk |

In her tradeoff analysis, the SSA found that "SM Resources has provided the government with the highest rated technical noncost proposal" and "had the lowest rated cost."  Based on her review, she concluded "that SM Resources Corporation offers the best overall value to the

Government and should receive the award." On September 22, 2011, ECBC awarded the contract to SMRC.

On September 26, 2011, the contracting officer (CO), acting as the SSA, notified Reema of the award to SMRC. On September 27, 2011, ECBC issued its first task order to SMRC. On September 30, 2011, Reema filed a protest with the CO, claiming that SMRC was not small for the procurement and was, therefore, ineligible for award. The CO forwarded this protest to the SBA, which, on December 29, 2011, sustained the protest. On January 13, 2012, SMRC and the CO appealed this ruling to the SBA's Office of Hearings and Appeals (OHA). On January 26, 2012, the CO prepared a memorandum discussing whether to proceed with the contract in light of the SBA's decision.[9] In that memorandum, the CO noted that the services provided by SMRC were "integral to the sustainment of the Edgewood Chemical Biological mission" and that failing to provide those services under the contract would make "mission failure . . . probable." She, therefore, concluded that performance could not be suspended during the pendency of the OHA appeal. In late February 2012, ECBC issued five new task orders to SMRC, each for a term of one year, with a one-year option period. On March 27, 2012, the OHA affirmed the SBA's size determination decision.

Following this affirmance, ECBC determined that it would neither issue any new task orders under the contract nor trigger any of the options on the existing task orders (leaving them to expire in late February 2013). On May 10, 2012, ECBC requested that this environmental sciences support services contract be removed from the SBA's 8(a) program. On July 2, 2012, ECBC issued a Request for Information (RFI) seeking white papers from entities interested in providing the services that SMRC is performing under the contract. The deadline for responses was July 23, 2012. Five contractors, two of whom were 8(a) certified, responded to the RFI; Reema did not respond. On or about August 23, 2012, ECBC and the SBA decided that the contract would be resolicited as a small business set aside rather than as an 8(a) set aside. On September 12, 2012, ECBC issued a services acquisition strategy document regarding the resolicitation of the contract at issue here as a small business set aside.

Meanwhile, on June 22, 2012, Reema filed its complaint in this court. On July 20, 2012, Reema filed a motion for judgment on the administrative record. On August 10, 2012, defendant filed a cross-motion for judgment on the administrative record. After briefing on these motions was completed, the court, on September 7, 2012, conducted oral argument on the cross-motions.

## II.   DISCUSSION

Like the Roman God Janus, plaintiff concurrently looks backward and forward in requesting relief.[10] Retrospectively, it claims that it is entitled to bid preparation and proposal costs relating to the procurement which led to the contract that ECBC is terminating.

---

[9] Although dated January 26, 2011, it is apparent that the memorandum was actually finalized on January 26, 2012.

[10] *See Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 752 (2003) ("Janus was the god of gates in Roman mythology, often portrayed having two faces – one looking forward, the other backward.").

Prospectively speaking, plaintiff seeks an injunction requiring ECBC to reprocure the services in question.  It acknowledges, however, that ECBC has already decided to do this, albeit not with the certainty  plaintiff might prefer.  Both requests for relief have evolved over the course of this case, in reaction to actions undertaken by ECBC.  Initially, plaintiff was concerned that its status as an 8(a) contractor would terminate before it could submit a proposal on what it expected would be an 8(a) reprocurement.  ECBC, however, has decided that the reprocurement will not be an 8(a) procurement, but rather a procurement limited to small businesses – for which plaintiff believes it is eligible.

For reasons that will become apparent, the court will analyze this case by focusing on the requested relief, beginning with plaintiff's claim seeking injunctive relief.

## A.      Injunctive Relief

In its motion for judgment on the administrative record, plaintiff argues that the court should prevent ECBC from continuing with performance of the 8(a) contract at issue because that award was made to a company that the SBA has held is ineligible for award.  As further basis for setting aside this award, Reema argues that ECBC did not fairly review its proposal consistent with the criteria used to evaluate other offers.  ECBC, however, has agreed to terminate the existing contract as of late February 2013, when several pending task orders expire.  And, with the approval of the SBA, ECBC also has agreed to reprocure the services in question not as an 8(a) procurement, but rather as a small business procurement.

These actions have left this case in an unusual posture, essentially turning the injunctive portion of this case into a review of the corrective action proposed by ECBC, *i.e.*, the termination of the existing contract and the proposed reprocurement of the services in question.  This court has jurisdiction to review whether an agency's corrective action is "'reasonable under the circumstances'" and "'appropriate to remedy the impropriety.'"  *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 65 (2001) (quoting *DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227, 238 (1999) and *Rockville Mailing Serv., Inc.*, 96-1 C.P.D. ¶ 184, at 3 (1996)); *see also Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 150-51 (2010).  Determining whether that jurisdiction lies here requires the court to focus on plaintiff's economic circumstances, the specific errors it asserts, and the relief it seeks.

For its banner claim, plaintiff challenges ECBC's interpretation and implementation of 13 C.F.R. § 121.1009(g)(2)(iii).  That provision states that "[i]f  [the SBA's OHA] affirms the size determination finding the protested concern ineligible, the contracting officer shall either terminate the contract or not exercise the next option."  *Id.*  Reema argues that because the contract here had only a base period, and no options, ECBC had no choice under this regulation, when the OHA sustained the SBA's size determination, but to terminate the contract.  The regulation did not, in plaintiff's view, permit ECBC to keep the existing task orders in place until they ran their course.  To be sure, Reema's construction of the regulation has plain-meaning appeal, while defendant's counter-argument suffers from a bit of regulatory *joie de revision*.[11]

_____

[11]  Defendant construes the phrase "shall either terminate the contract or not exercise the next option" as referring not to the option on the contract (of which there was none), but rather to the multiple options existing on the task orders issued under the contract.  At the very least, this

But, it does not appear that the court need address these points because of several admissions made by Reema.

First, in admirable candor, Reema admits that the support services in question are essential to the performance of critical defense tasks and that ECBC could not terminate the contract immediately without providing an interim plan for continuing those services.  Second, it concedes that the timing of the reprocurement planned by ECBC is roughly the same as what it would expect were this court to adopt plaintiff's interpretation of the regulation and issue an injunction.  Finally, Reema makes no pretense that it is entitled to provide the services in question on an interim basis, before the reprocurement occurs, recognizing that the agency has a variety of options in deciding how to bridge this gap.  The net effect of these admissions is to suggest that the agency is doing voluntarily what Reema would have this court command.  Unfortunately for plaintiff, this scenario raises questions as to whether Reema has standing to pursue injunctive relief challenging ECBC's proposed corrective action here.

This court has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002) (citing 31 U.S.C. § 3551(2)(A)); *see also Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  In addition, "the plaintiff in a bid protest must show that it has standing to bring the suit."  *L-3 Global Commc'ns Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 608 (2008) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  Although the Court of Federal Claims, an Article I court, "applies the same standing requirements enforced by other federal courts created under Article III," *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003), the Federal Circuit has determined that 28 U.S.C. § 1491(b)(1) "imposes more stringent standing requirements than Article III."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *see also Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

"The pivotal element of standing in a bid protest is whether a protester qualifies as an 'interested party' under [section] 1491(b)(1)."  *RhinoCorps Ltd. Co. v. United States*, 87 Fed. Cl. 481, 485 (2009); *see also Sys. Application & Techs.*, 691 F.3d at 1382.  The Federal Circuit has construed the term "interested party" as synonymous with the term "interested party," as defined in the Competition in Contracting Act, 31 U.S.C. § 3551(2)(A).  *See Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302; *see also Avtel Servs., Inc. v. United States*, 501 F.3d 1259, 1261 (Fed. Cir.

---

warped construction of the regulation violates the commonsense canon of *noscitur a sociis* – "which counsels that a word is given more precise content by the neighboring words with which it is associated."  *United States v. Williams*, 553 U.S. 285, 294 (2008); 2A Norman Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 47.16 (7th ed. 2007).  Indeed, if defendant is right that the regulation permits any task order issued before a size determination is sustained to go to term, an agency could perpetuate an otherwise disqualifying contract by issuing such orders before the underlying contract was terminated.

2007); *Int'l Genomics Consortium v. United States*, 104 Fed. Cl. 669, 673 (2012).  In order to have standing as an "interested party," a protester must satisfy a two-part test.  First, the protester must demonstrate that it is an actual or prospective bidder.  *Sys. Application & Techs.*, 691 F.3d at 1382; *Rex Serv. Corp.*, 448 F.3d at 1307; *see also MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation").  Second, the protester must demonstrate that it has a direct economic interest in the procurement.  *Rex Serv. Corp.*, 448 F.3d at 1307; *see also Sys. Application & Techs.*, 691 F.3d at 1382; *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).

In order to establish a direct economic interest in the procurement, a protester must demonstrate prejudice.  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing").  The way this is done depends upon the nature of the protest.  In post-award bid protests, a protester must show that it had a "substantial chance" of receiving the contract.  *Rex Serv. Corp.*, 448 F.3d at 1308.  By contrast, in preaward bid protests "there have been neither bids/offers, nor a contract award," precluding the court from applying the "substantial chance" standard.  *Weeks Marine*, 575 F.3d at 1361.  Instead, the Federal Circuit has indicated that a protestor must allege a "'non-trivial competitive injury which can be addressed by judicial relief.'"  *Id.* at 1362 (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed.Cl. 748, 763 (1998)); *see also Sys. Application & Techs.*, 691 F.3d at 1382; *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 517 (2011).  This standard, the Federal Circuit recently noted, "strikes the appropriate balance between the language of § 1491(b)(1) . . . and Article III standing requirements."  *Weeks Marine*, 575 F.3d at 1362.  The court, therefore, must consider whether, in challenging ECBC's proposed corrective action, Reema has alleged "a non-trivial competitive injury which can be addressed by judicial relief."  The court concludes that it has not.

Reema will not be competitively injured if ECBC timely implements its proposed reprocurement schedule, which is essentially the same as what Reema would have this court adopt via an injunction.  Indeed, despite plaintiff's early arguments in this case, which focused on its status under the 8(a) program, the schedule proposed by ECBC, as well as the type of procurement envisioned, would not deny Reema a fair opportunity to compete for the reprocurement.  As such, the only thing plaintiff arguably would gain by having this court issue an injunction is the certainty that ECBC would not deviate from its plans.  But, there are two problems with this approach.  First, it is not for this court to enjoin ECBC from possibly injuring plaintiff in the future by deviating from its plans.  Rather, for plaintiff to have an "injury which can be addressed by judicial relief," *Weeks Marine*, 575 F.3d at 1362, that injury must be "actual or impending," and not one that "has not occurred yet, is far from imminent, and, indeed, may never occur."  *Bos. Harbor Dev. Partners, LLC v. United States*, 103 Fed. Cl. 499, 504-05 (2012) (holding that plaintiff lacked standing to assert that agency evaluators might be biased in the conduct of a reprocurement); *see also Int'l Genomics Consortium*, 104 Fed. Cl. at 679.  Second, even if the court could protect Reema from a speculative injury, it is far from obvious how it could do that without impermissibly micromanaging the reprocurement process, *i.e.*, by imposing fast deadlines to what otherwise should be an exercise of agency discretion.  This court will not do that, at least without a much greater showing of potential harm.

Coming at this differently, it should not be overlooked that injunctive relief would be denied here if, apart from the merits, the court focused on whether plaintiff, in the absence of an

injunction, would suffer irreparable harm.  To obtain a permanent injunction, a party must show that:  (i) it has succeeded on the merits; (ii) it will suffer irreparable harm if such relief is not granted; (iii) the balance of the hardship tips in its favor; and (iv) an injunction will serve the public interest.  *See, e.g.*, *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *PGBA, LLC v. United* States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  While it is oft-stated that a "weakness of the showing regarding one factor may be overborne by the strength of the others," *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993), that balancing argument only goes so far, for it is axiomatic that the basis for a grant of permanent injunctive relief "has always been irreparable harm and inadequacy of legal remedies." *Rondeau v. Mosinee Paper Corp*., 422 U.S. 49, 57 (1975) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  It follows that in the absence of a showing of irreparable harm or the inadequacy of legal remedies, no permanent injunction can issue.  *See Rondeau*, 422 U.S. at 56; *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

Nor is there reason to think that these traditional principles of equity somehow are relaxed in bid protests because the relief therein derives from a statute.  *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391-94 (2006) (holding that traditional injunctive principles apply to disputes arising under the Patent Act).  *Per contra*.  Various decisions hold that Congress can alter the traditional formula for awarding an injunction only through a clear and valid legislative command mandating relief in a particular instance.  *See eBay*, 547 U.S. at 391-92; *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542, 544-45 (1987); *Weinberger*, 456 U.S. at 313.  Here, there is no such command; instead, the statute grants this court the discretion to provide such relief as "the court considers proper."  28 U.S.C. § 1491(b)(2).

Accordingly, the court concludes that plaintiff lacks standing to seek any injunctive relief in this case.  Nothing about this ruling, however, necessarily precludes plaintiff from seeking compensatory relief in the form of bid preparation and proposal costs, a topic to which we now turn.

## B.    Bid Preparation and Proposal Costs

Section 1491(b)(2) of Title 28 provides that this court "may award any relief that the court considers proper . . . except that any monetary relief shall be limited to bid preparation and proposal costs."  This provision "provides the Court of Federal Claims with discretion in fashioning relief."  *PGBA*, 389 F.3d at 1226; *see also Ala. Aircraft Indus., Inc. – Birmingham  v. United States*, 85 Fed. Cl. 558, 562 (2009), *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009) (tracing the history of this provision); *Beta Analytics Int'l, Inc. v. United States*, 75 Fed. Cl. 155, 159 (2007).  Before exercising this discretion, the court must first determine whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4); *NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 518 (2011).

Plaintiff makes two claims in this regard.  First, it asserts that ECBC acted contrary to the relevant regulations in awarding the contract to an offeror that did not qualify as a small business within the NAICS code involved.  Second, it contends that ECBC applied the evaluation criteria in the RFP inconsistently, in rating Reema's and SMRC's proposals differently.

Plaintiff's first assertion would be more tenable if the governing regulations required ECBC to confirm SMRC's eligibility prior to making an award. They do not. To be sure, under those regulations, an agency generally determines a business' size status as of the date the offeror submits its initial offer. 48 C.F.R. § 19.301-1(a). That determination, however, is based on the offeror's "self-certification that it is small to the contracting activity." *Enter. Info. Servs., Inc.*, 2010 CPD ¶ 213, at 2 (2010). Thus, under the regulations, the offeror must represent "that it is a small business concern in connection with a specific solicitation," which representation it may make "if it meets the definition of a small business concern applicable to the solicitation and has not been determined by the Small Business Administration (SBA) to be other than a small business." 48 C.F.R. § 19.301-1(a); *see also* 48 C.F.R. § 52.204-8(d) (discussing representations and certifications). Under the Federal Acquisition Regulation (FAR), the contracting officer "shall accept an offeror's representation . . . that it is a small business unless (1) another offeror or interested party challenges the concern's small business representation or (2) the contracting officer has a reason to question the representation." 48 C.F.R. § 19.301-1(b). Under this regulation, the CO here thus was required to accept SMRC's representations regarding its size unless one of the two exceptions to that rule was triggered. And, as will be seen, neither of those exceptions were triggered.

By the time the CO received Reema's size protest, she had already awarded the contract to SMRC.[12] Nothing in the regulations requires a contracting officer to suspend or terminate a contract based upon the filing of a size protest. *See* 13 C.F.R. § 121.1009. On December 29, 2011, the SBA issued a size determination concluding that SMRC was not small for the procurement at issue and was, therefore, ineligible for the award. The regulations provide that if a contracting officer receives a determination that the awardee is not an eligible small business for the procurement in question, and "no OHA appeal has been filed, the contracting officer shall terminate the award." *Id*. at § 121.1009(g)(2)(i). Here, however, a timely OHA appeal was filed, which, under the regulations, gave the CO discretion to determine "whether performance can be suspended until an appellate decision is rendered." *Id*. at § 121.1009(g)(2)(ii). And, the CO, exercising this authority, determined that the contract should proceed. The OHA then affirmed the size determination finding, requiring the CO, under the regulations discussed above, to "either terminate the contract or not exercise the next option." *Id*. at § 121.1009(g)(2)(iii).

Reema, however, asserts that the CO had reason to question SMRC's representations about its size and should have referred the matter to the SBA pursuant to 48 C.F.R. § 19.301-1(b). But, this claim proves too much. Plaintiff points to nothing in SMRC's proposal that should have triggered an inquiry. Rather, it argues that the CO should have questioned SMRC's status because the awardee failed to list NAICS code 541620, Environmental Consulting Services, on its profile in the Central Contractor Registration (CCR) system previously

---

[12]   Contrary to plaintiff's claims, the CO did not err in failing to provide Reema with a preaward notice that the contract would be awarded to SMRC. The controlling regulation, 48 C.F.R. § 15.503(a)(2)(iii), in fact, indicates that such a "notice is not required . . . when the contract is entered into under the 8(a) program." *See Size Appeal of: S4, Inc.*, 2008 WL 2958382 (S.B.A. June 27, 2008).

maintained by the General Services Administration (GSA).[13]  This claim is a red herring for several reasons.

For one thing, the regulations that governed that system did not oblige SMRC to list itself as qualifying under any particular NAICS code in order to be eligible to make an offer.  Nor did they suggest that the CO was obliged to examine SMRC's CCR listing prior to making an award.  Rather, it appears that the CCR system was designed primarily to assist government agencies in performing market research and in administering contracts post-award.  *See* 48 C.F.R. §13.102; *see also Shirlington Limousine & Transp., Inc. v. United States*, 77 Fed. Cl. 157, 160 n.5 (2007).  There is no indication that the system was also to be used in examining proposals.  Indeed, the regulations did not require small businesses to register before making an offer, but only required them to do so immediately prior to receiving an award.  48 C.F.R. § 52.204-7(b)(1) ("[b]y submission of an offer, the offeror acknowledges the requirement that a prospective awardee shall be registered in the CCR database prior to award"); *see also Nilson Van & Storage, Inc. v. United States*, 99 Fed. Cl. 408, 416-17 (2011); *JGB Enters., Inc. v. United States*, 63 Fed. Cl. 319, 322 (2004).[14]  Accordingly, there is utterly no reason to believe that SMRC's failure to list any particular information in its CCR profile should have engendered suspicions regarding its size status.  As such, the court must conclude that the CO acted reasonably under the circumstances, which is all that is required.  *See Reliable Builders, Inc.*, 2010 CPD ¶ 260, at 5 (2010); *Synergetics, Inc.*, 2007 CPD ¶ 168, at 2 (2007).

Plaintiff next claims it is entitled to bid preparation and proposal costs because ECBC improperly evaluated its proposal.  But, the court need not resolve this dispute – or address whether the agency afforded SMRC benefits that were unwarranted – because, as it turns out, there is a fatal flaw in plaintiff's claim for damages.

"Bid preparation and proposal costs can be awarded by courts as an appropriate way to try to compensate, at least in part, a victim of unjust government action during the procurement process."  *CNA Corp. v. United States*, 83 Fed. Cl. 1, 11 (2008).  Such costs are recoverable only if three conditions are satisfied:  (i) the agency has committed a prejudicial error in conducting the procurement; (ii) that error caused the protester to incur unnecessarily bid preparation and proposal costs; and (iii) the costs to be recovered are both reasonable and allocable, *i.e.*, incurred specifically for the contract in question.[15]  Though often not discussed explicitly in cases, the

---

[13]  In July of 2012, the CCR was replaced by the System for Award Management (SAM), a GSA website that consolidates registration data from a number of procurement sources.  *See* System for Award Management, https://www.sam.gov (last visited on Nov. 6, 2012, at 11:16 a.m. EST).

[14]  Nor did these regulations require a registrant to update continuously its profile.  Instead, they anticipated that contractors would update their profiles on an annual basis.  *See* 48 C.F.R. § 52.204-7(f).

[15]  For cases supporting the first two of these prongs, *see Ala. Aircraft Indus.*, 85 Fed. Cl. at 565; *Klinge Corp. v. United States*, 83 Fed. Cl. 773, 774 (2008) (bid preparation costs awarded where "there is a causal connection between the first and second procurements – the RFQ probably would not have been issued but for the mistake . . . ."); *CNA Corp.*, 83 Fed. Cl. at 11;

second prong of this three-part test is designed "to place the plaintiff in the position he or she would have occupied but for defendant's wrong." *Ala. Aircraft Indus.*, 85 Fed. Cl. at 565; *see also CNA Corp.*, 83 Fed. Cl. at 11 (bid preparation and proposal costs permissible where such costs would not have been unnecessarily incurred "but for the arbitrarily and capriciously issued . . . decision"). Reflecting this view, where defendant's wrongful action requires a protester to submit a second proposal, this court has allowed the recovery of bid preparation and proposal costs for a first proposal as a way to provide the protester a complete remedy.[16] But, this same second prong, with its causation requirement, can disqualify a protester from receiving compensation if it would have incurred additional bid preparation and proposal costs even if the agency had not committed an error.

In the case *sub judice*, plaintiff cannot show that the bid preparation and proposal costs it incurred in creating its first proposal were rendered unnecessary by the arbitrary, capricious, or otherwise erroneous actions committed by ECBC. Rather, the situation in which plaintiff finds itself – unable to receive an award on its earlier proposal and compelled to seek an award, if at all, via a new one – stems not from agency misfeasance, but from the way the regulations deal with the timing of the size determination made by the SBA. In particular, plaintiff's plight, such as it is, derives from the fact that the drafters of those regulations decided to allow agencies to proceed with certain contracts pending the ultimate resolution of the size protest. And, of course, that is what happened here.

Only in the meekest terms does plaintiff yet argue that ECBC should award it the contract in question, rather than conduct a reprocurement. Its hesitation is well-founded as there are statutory and practical impediments that prevent ECBC from reevaulating the first set of

---

PGBA, LLC v. United States, 60 Fed. Cl. 196, 222 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004); *see also PRC Inc. v. Widnall*, 64 F.3d 644, 647 (Fed. Cir. 1995); *Three S Consulting v. United States*, 104 Fed. Cl. 510, 522 n.11 (2012); *Lumetra v. United States*, 84 Fed. Cl. 542, 549 (2008). For cases supporting the third of these prongs, *see CNA Corp.*, 83 Fed. Cl. at 11; *Geo-Seis Helicopters, Inc. v. United States*, 79 Fed. Cl. 74, 80 (2007); *Beta Analytics Int'l*, 75 Fed. Cl. at 159; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 61 Fed. Cl. 175, 182 (2004); *Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 629, 630-31 (2002); *see also Coflexip & Servs., Inc. v. United States*, 961 F.2d 951, 953 (Fed. Cir. 1992); 48 C.F.R. §§ 31.201-3, 31.201-4.

[16]   *See Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 132 (2011); *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 369 (2009); *Klinge Corp.*, 83 Fed. Cl. at 780. This is not to say that the recovery of such costs is limited to this factual scenario. Defendant has unsuccessfully argued that a protester may not obtain both injunctive relief and bid preparation and proposal costs. *See Ala. Aircraft Indus.*, 85 Fed. Cl. at 562-63; *CNA Corp.*, 83 Fed. Cl. at 10-11 (rejecting this claim and citing various cases). Moreover, courts have awarded bid preparation and proposal costs where defendant's errors rendered a first proposal unnecessary or wasted even where, under the circumstances presented, a second procurement did not follow. *See, e.g.*, *PGBA*, 60 Fed. Cl. at 221-23.

proposals, none the least of which is the fact that they are now three years old.[17]  (And, it goes almost without saying, this court is in no position to order such an award).  It follows, *a fortiori*, that if plaintiff must prepare a second offer if it hopes to receive the award in question, and must do so regardless of whether ECBC evaluated its first offer properly *vel non*, it cannot obtain bid preparation and proposal costs for that first proposal.  Those costs were not rendered a '"needless expense"' by defendant's erroneous conduct, *CNA Corp.*, 83 Fed. Cl. at 9 (quoting *Heyer Prods. Co. v. United States*, 135 Ct. Cl. 63, 71 (1956)), but rather were lost due to the proper application of the procedural regulations implementing the size standards.

Accordingly, plaintiff has failed to satisfy the second prong of the requirements for receiving bid preparation and proposal costs, *to wit*, that a prejudicial error committed by the agency be the cause of its incurring unnecessarily the bid preparation and proposal costs it seeks.  Therefore, the costs it seeks are not recoverable.

**III.    CONCLUSION**

Based on the foregoing, the court concludes that it lacks jurisdiction to consider plaintiff's claim for injunctive relief and that plaintiff is not otherwise entitled to bid preparation and proposal costs.  Accordingly, plaintiff's motion for judgment on the administrative record is hereby **DENIED**, and defendant's cross-motion for judgment on the administrative record is hereby **GRANTED**.[18]

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[17]  In addition, Reema was the only arguably eligible offeror because SMRC was too big and Bowhead was viewed as unqualified.  Upon a reevaluation, ECBC arguably could not award the contract to Reema because of 15 U.S.C. § 637(a)(1)(D)(i), which requires that an 8(a) contract with an award price in excess of $3 million "be awarded on the basis of competition."

[18]  The court intends to unseal and publish this opinion after November 20, 2012.  On or before November 19, 2012, each party shall file proposed redactions to this opinion, with specific reasons therefor.